UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENYATTA ARNOLD, | No. C 05-4048 MHP (pr) |
|     Petitioner, | **ORDER DENYING HABEAS PETITION** |
|     v. | |
| S. W. ORNOSKI, | |
|     Respondent. | |

### INTRODUCTION

Kenyatta Arnold, a prisoner at San Quentin State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

### BACKGROUND

Kenyatta Arnold was convicted in Alameda County Superior Court of second degree murder and was sentenced to 15 years to life in state prison. Arnold's habeas petition does not concern that 1983 conviction directly, but instead focuses on an August 27, 2003 decision by a panel of the Board of Prison Terms (now known as the Board of Parole Hearings ("BPH")) finding him not suitable for parole.

The BPH identified several factors in support of its determination that Arnold was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released. The factors identified included the circumstances of the crime, his escalating pattern of criminal conduct before the murder, the recency of his

1

positive programming in prison, and a concern about his involvement in the Ansar El Mohammad group. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Arnold sought relief in the California courts. The Alameda County Superior Court denied his petition for writ of habeas corpus in 2004 in a short order. Resp. Exh. 21. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review. Resp. Exhs. 23 and 26.

Arnold then filed his federal petition for writ of habeas corpus. The court construed Arnold's federal petition for writ of habeas corpus to allege a due process violation based on the alleged absence of some evidence to support the BPH's decision. Respondent filed an answer and petitioner filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because Arnold was incarcerated and the challenged action occurred at San Quentin State Prison in Marin County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits

in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).  Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

Where, as here, the state court gives no reasoned explanation of its decision on a petitioner's federal claim, the federal habeas court does an independent review of the record as it is the only means of deciding whether the state court's decision was objectively reasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The Alameda County Superior Court's decision was so short and conclusory that it does not qualify as a reasoned explanation. See Resp. Exh. 21.  The California Court of Appeal's and California Supreme Court's summary dismissals also do not qualify as reasoned explanations.

**DISCUSSION**

A.      Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that

1    could support the conclusion reached'" by the parole board.  Id. at 1128 (quoting
2    Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and
3    assures that 'the record is not so devoid of evidence that the findings of the . . . board were
4    without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472
5    U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law
6    in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.
7         A critical issue in parole denial cases concerns the BPH's use of evidence about the
8    crime that led to the conviction.  Three Ninth Circuit cases provide the guideposts for
9    applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune,
10   334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir.
11   2007).  Biggs explained that the value of the criminal offense fades over time as a predictor
12   of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful
13   balancing and assessment of the factors considered. . . .  A continued reliance in the future on
14   an unchanging factor, the circumstance of the offense and conduct prior to imprisonment,
15   runs contrary to the rehabilitative goals espoused by the prison system and could result in a
16   due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole
17   release date based solely on the nature of the crime and the prisoner's conduct before
18   incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate
19   exemplary behavior and evidence of rehabilitation, denying him a parole date simply because
20   of the nature of Biggs' offense and prior conduct would raise serious questions involving his
21   liberty interest in parole."  Id. at 916.  Next came Sass, which criticized the Biggs statements
22   as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not
23   our function to speculate about how future parole hearings could proceed."  Sass, 461 F.3d at
24   1129.  Sass determined that the parole board is not precluded from relying on unchanging
25   factors such as the circumstances of the commitment offense or the parole applicant's pre-
26   offense behavior in determining parole suitability.  See id. at 1129 (commitment offenses in
27   combination with prior offenses provided some evidence to support denial of parole at
28   subsequent parole consideration hearing).  Recently, Irons determined that due process was

4

not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence.  <u>Irons</u> emphasized that all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."  <u>Irons</u>, 479 F.3d at 665; <u>see e.g.</u>, <u>id.</u> at 660 (inmate in 16th actual year of his 17-to-life sentence).

   The message of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and <u>Irons</u>).  <u>Sass</u> did not dispute the principle that, other things being equal, a criminal act committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago.  Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>.  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

   Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies.  One must look to state law to answer the question, "'some evidence' of what?"

B. <u>State Law Standards For Parole For Murderers In California</u>

   California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a base term of 25 years to life and a second degree murder conviction yields a base term of 15 years to life imprisonment.  <u>See</u> <u>In re</u>

5

1  Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal
2  Code § 190.  The upshot of California's parole scheme described below is that a release date
3  normally must be set unless various factors exist, but the "unless" qualifier is substantial.

4        A BPH panel meets with an inmate one year before the prisoner's minimum eligible
5  release date "and shall normally set a parole release date. . . . The release date shall be set in a
6  manner that will provide uniform terms for offenses of similar gravity and magnitude in
7  respect to their threat to the public, and that will comply with the sentencing rules that the
8  Judicial Council may issue and any sentencing information relevant to the setting of parole
9  release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the
10 panel "shall set a release date unless it determines that the gravity of the current convicted
11 offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
12 is such that consideration of the public safety requires a more lengthy period of incarceration
13 for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.
14 Penal Code § 3041(b).

15       One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole
16 date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A
17 parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A
18 parole date set under this article shall be set in a manner that provides uniform terms for
19 offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The
20 regulation also provides that "[t]he panel shall first determine whether the life prisoner is
21 suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be
22 found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
23 an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §
24 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal.
25 Code Regs. § 2402(b).

26       The regulations contain a matrix of suggested base terms for several categories of
27 crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix
28 of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,

6

1  depending on some of the facts of the crime.   Some prisoners estimate their time to serve
2  based only on the matrix.   However, going straight to the matrix to calculate the sentence
3  puts the cart before the horse because it ignores critical language in the relevant statute and
4  regulations that requires the prisoner first to be found suitable for parole.

5  The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").  The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable.  "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

C. <u>Some Evidence Supports The BPH's Decision In Arnold's Case</u>

The BPH found Arnold unsuitable for parole based on the circumstances of the murder, his prior criminality, the recency of his prison progress, and a concern about his membership in Ansar El Muhammed.

1. <u>Commitment Offense</u>

Arnold's conviction for murder stems from a robbery during which the victim had a heart attack and died. The facts of the crime were described in the life prisoner evaluation report:

> The victim Lester King, age 75, had just dropped his wife Mary off at the doctor's office where she was undergoing chemotherapy for cancer. Mr. King parked the car in the MB Center garage and took their pet poodle for a walk. The defendant and his juvenile co-defendant, Deron Williams, saw the victim park the car and began to follow him. The two decided to rob the victim and steal his car. The defendant (Arnold) grabbed the victim from behind, while Williams went in his pocket for the car keys. The victim broke free and swung at Williams but missed. In the struggle, the victim fell to the ground, while Arnold took his wallet from his back pocket. The two ran back to the MB Center where they stole the victim's car.

Resp. Exh. 6, p. 1. Arnold and Williams drove away and picked up a friend. When they were seen later that day by police in the victim's car, a high speed chase ensued, at the end of which Arnold and Williams were apprehended. <u>Id.</u>

A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2402(c)(1).

The BPH relied on the commitment offense to deny parole, finding that it was "carried out in a rather cold-hearted manner and it was callous. The man, the gentleman was old. The offense was carried out in a dispassionate and a calculated manner. The offense was carried out in a manner that showed a disregard for the elderly, the vulnerable of our society, and the motive for the crime was inexplicable." RT 80.

Arnold was liable on a felony murder theory based on the robbery victim's fatal heart attack during a robbery. The crime of robbery is one of the listed felonies in California Penal

8

1  Code § 189 for which the killing is deemed a first degree murder. That means that the crime
2  in this case involved more than the minimum elements of the crime of second degree murder.
3  Cf. Dannenberg, 34 Cal. 4th at 1071; In re Rosenkrantz, 29 Cal. 4th at 682-83. That is, the
4  crime here had the elements necessary for a first degree murder, even though a plea
5  agreement was reached for a second degree murder conviction. In fact, Arnold had
6  originally been charged with first degree murder, robbery, and a violation of California
7  Vehicle Code § 10851 (i.e., theft and unlawful driving of a vehicle), and entered a negotiated
8  plea. See Resp. Exh. 2, p. 2. Even though the commitment offense was sufficient to support
9  the denial of parole beyond the minimum term of the 15-to-life sentence, this crime does not
10 fit well under the listed factors tending to show the commitment offense to have been
11 committed "in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. §
12 2402(c)(1). Arnold and Williams preyed on an elderly man because that man was an easier
13 target than someone who was younger and more fit. RT 10. There was no weapon involved
14 in the robbery, and although the victim was elderly and shoved to the ground, the stress of
15 the robbery rather than that shove caused his heart attack. RT 9. These observations are not
16 made to minimize the tragedy of the death of the victim, but only to recognize that Arnold's
17 acts do not have the hallmarks of a killing done in an especially heinous, atrocious or cruel
18 manner. The murder was one of several circumstances relied upon to deny parole and could
19 be considered in conjunction with other circumstances as tending to show unsuitability for
20 parole.

     2.     Prior Criminality

22     The BPH is directed by the regulation to consider all relevant and reliable information
23 in determining suitability for parole, including the prisoner's "past criminal history, including
24 involvement in other criminal misconduct which is reliably documented." 15 Cal. Code
25 Regs. § 2402(b). Among the specific circumstances listed as tending to indicate unsuitability
26 is a previous record of violence, such as if the prisoner had "on previous occasions inflicted
27 or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated
28 serious assaultive behavior at an early age." 15 Cal. Code Regs. § 2402(c)(2).

9

1    Arnold had a criminal history before the commitment offense. He had been arrested
2 for disturbing the peace and possession of stolen property, although he was not convicted or
3 put in custody for either offense. RT 13. As an adult, he had been convicted of grand theft
4 or burglary and was in the midst of a 24-month probation for that crime when the felony
5 murder occurred. RT 13-14.

6    The BPH considered a circumstance proper under California law in finding that
7 Arnold's criminal record showed he was unsuitable for parole. The fact that the commitment
8 offense was committed while he was on probation indicated he had failed to profit from
9 society's previous attempts to correct his criminality. As with the commitment offense,
10 Arnold's prior criminality was but one part of the overall picture of him that the BPH
11 properly considered in determining whether he was suitable for parole.

### 3. Institutional Performance

13    Section 2402(b) specifically allows the BPH to consider a great range of relevant and
14 reliable information, such as the prisoner's social history and mental state. The BPH also
15 may consider evidence that the "prisoner has engaged in serious misconduct in prison or jail"
16 as tending to indicate unsuitability for parole. 15 Cal. Code Regs. § 2402(6).

17    Arnold had been incarcerated for 20 years but had only been disciplinary-free for the
18 last eight years before the hearing. Arnold had received six CDC-115 rule violation reports
19 for serious rule violations, the most recent of which occurred in 1995. RT 23. In 1991, he
20 received a CDC-115 for sexual misconduct in the visiting room, in 1992, he received a CDC-
21 115 for "gang activity" which concerned his connection to Ansar El Muhammed discussed
22 below, in 1994, he received a CDC-115 for "unlawful influence" for trying to intimidate a
23 staff member not to report his misconduct, and in 1995 he received a CDC-115 for
24 possession of marijuana and another CDC-115 for having a positive urinalysis test for
25 marijuana. See Resp. Exh. 6, p. 5. He lost time credits for each of these offenses. He also
26 had six CDC-128s, which were counseling chronos for lesser rules transgressions, the last of
27 which was in 1990.

28    The one rule violation report that caused great concern to the BPH panel was from

1992.  See Resp. Exh. 12.  The CDC-115 stated:

> On April 24, 1992, an investigation regarding a group of inmates identifying themselves as "ANSAR EL MUHAMMAD" was concluded.  Information obtained through the investigative process indicated that inmate Arnold, K., was a Captain in the "ANSAR" EL MUHAMMAD and was responsible for carrying out the discipline to members who deviate from the teachings of the "ANSAR."  Upon being released from prison, some members of the "ANSAR's" have been involved, as a group, in structured criminal activity, and have been involved in violent confrontations with Law Enforcement Agencies in the community.

Resp. Exh. 12.  A hearing was held and Arnold was found guilty of gang activity and assessed a forfeiture of time credits.  Id.

The BPH was very concerned about Arnold's involvement with Ansar El Muhammed ("AEM").  AEM was thought to be a gang by the FBI and the district attorney, although the CDC apparently considered it a disruptive group rather than a prison gang.  See RT 25, 49, 75; Resp. Exh. 9, p. 3.   The disciplinary offense occurred in 1992, but there was conflicting evidence as to whether Arnold still was connected to AEM in 2003.  Compare Resp. Exh. 6, p. 7, and RT 67-72 (commissioners noting presence of information about his 1992 membership in AEM disruptive group exists in his file) with RT 61 (Arnold denies membership in AEM), and id. (Arnold had been in contact with the AEM people when he was in Solano and they "all studied together"), and id. at 62, 74 (Arnold defends the good members of AEM but not those who commit crimes).  Arnold described AEM as a "religious group" whose name had been sullied by "a handful of people, misfits, who went out to the streets, got caught up in some trouble and ended up in associated their deeds and actions along with the group."  RT 25.  He stated that "there's a lot of different wonderful works that [AEM had] been doing in the community."  Id.  He stated that other than the "handful of guys" who robbed people and did "a bunch of unspeakable things," there had been no other acts like that committed by the group.  RT 26.  AEM was started at the Solano prison. See id.

Although Arnold's attorney objected to the District Attorney's reliance on the AEM connection to say Arnold was unsuitable, the objection was overruled.  RT 49-50.  The presiding commissioner stated that he did "know that there was a lot of concern about this religious sect and that there was a lot of concern in terms of whether or not they would pose a

11

threat, whether it be in the institution or in the community.  And I'm not so sure that there's still not a lot of concern about this group in the community.  And I think it's a valid issue that the District Attorney raised." RT 51.  The commissioner noted that Arnold's attorney would have an opportunity to rebut the District Attorney's views.  Id.  The attorney argued against the District Attorney's statements but did not present his own evidence regarding AEM.

The BPH's concern about the possibility that Arnold might be in a disruptive group was supported by evidence and provided a strong reason to find him unsuitable.  Under the worst light, the evidence suggested that Arnold might be the enforcer in an organized crime entity.  The possibility that the inmate is connected to a street gang or group whose members engage in organized criminal activities in the community goes to the heart of the BPH's determination whether "the prisoner will pose an unreasonable risk of danger to society if released from prison," see 15 Cal. Code Regs. § 2402(a).  The BPH properly denied parole in light of the unsettled state of the record regarding the inmate's affiliation with the AEM.

The BPH also wanted an updated psychological evaluation to obtain an indication as to Arnold's violence potential if released from prison.  The psychological report in the file was from 1999, and indicated that the findings for that year were consistent with those in 1996, 1993 and 1990.  The diagnostic impression of adult antisocial behavior remained constant.  RT 32.  The panel apparently wanted a psychological evaluation that compared Arnold's violence potential relative to the unincarcerated population if released into the community because the psychological evaluator opined only that his potential for violence was below average compared to other San Quentin inmates.  See RT 34; Resp. Exh. 7, p. 3.  The BPH also could rely on the need for a further psychological evaluation to deny parole, as the regulations permit it to consider the inmate's "past and present mental state." See 15 Cal. Code Regs. § 2402(b).  Although prison authorities' failure to assemble the materials needed to evaluate a prisoner might at some point require a different analysis, the incomplete psychological evaluation here left a gap in the overall picture of Arnold and the BPH was not required to assume the missing information would be positive information.

The BPH also appeared to rely on the recency of Arnold's positive programming as

tending to show that he was not suitable for parole and required further incarceration. The positive reports about Arnold's prison behavior did not start until after 1994, when he apparently changed his attitude. The BPH's consideration of and reliance on Arnold's unfavorable conduct in prison during the first twelve years of his incarceration was supported by sufficient evidence.

        4.       <u>There Was Enough Evidence To Support The Decision</u>

The weight to be attributed to the commitment offense and pre-conviction criminality may fade over time as a predictor of current dangerousness, but the rate at which those facts fade as predictors slows down when the prisoner engages in further misconduct and does not demonstrate rehabilitation. Here, Arnold had accumulated five CDC-115 rule violation reports after he was put in prison. Although the most recent CDC-115s occurred eight years before the hearing, they indicated an unwillingness to comply with rules and laws. While prisoners may criticize the use of the unchanging evidence of pre-incarceration events, in-prison behavior is something the prisoner has control over, and the fact that a prisoner continues to receive disciplinary write-ups indicates that he does not have a very high level of self-control, especially when the misconduct occurs years into the sentence and at a time when he should realize how it will reflect on his parole suitability. <u>Biggs</u> and <u>Irons</u> did not stand for the proposition that in-prison behavior doesn't matter -- to the contrary, they stand for the proposition that old bad facts can at a certain point be overcome by more recent good facts regarding a prisoner's ability to conform to societal norms. Arnold's continued misconduct in prison plus the conflicted evidence on whether he was affiliated with the AEM support the BPH's view that he is not suitable for parole and would present a danger to society if released on parole even though he had already been in prison 20 actual years since his 15-to-life sentence was imposed.

Having conducted an independent review of the record, this court concludes that there was some evidence to support the BPH's determination that Arnold was unsuitable for parole based on the circumstances of the commitment offense, his prior criminality, and his in-prison behavior. The crime alone might support the BPH's decision, but certainly the

13

cumulative effect of these several circumstances supported the determination that Arnold was not suitable for parole. See 15 Cal. Code Regs. § 2402(b). The state court's rejection of Arnold's insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard. He is not entitled to the writ.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: May 31, 2007

Marilyn Hall Patel
United States District Judge

**NOTE**

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).